The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an attention, for the Court is now sitting. God save the United States and this Honorable Court. Ms. Kahn, happy to hear from you. Good morning, distinguished members of the panel. May it please the Court. My name is Marta Kahn. I represent the Appellant's Manor, Okechukwo Otuya. Our brief presents five issues. Unless the panel wishes otherwise, I will simply begin to address them in order. The first issue raises whether the lower court erred by introducing a large quantum of evidence under the guise that it was intrinsic evidence, when in fact it was not. The charged conspiracy charged Mr. Otuya with being a part of a convenience check theft scheme, whereby various groups of people would steal mail from mailboxes and then get student accounts from students at local universities and deposit the stolen checks and process them through those accounts. This conspiracy was alleged to have occurred between March of 2007 and September of 2009. The government then proceeded to introduce evidence that related to material that was seized from Mr. Otuya's backpack upon his arrest in late 2010. This evidence included images of checks on a laptop, which pointed to the creation of counterfeit checks. It had nothing to do with the MO of the original charged conspiracy. It did not share to any appreciable extent the same co-conspirators as were involved in the original conspiracy. Again, it was 18 months later in time frame. Thus, it was- You're taking money out of the Bank of America on both ends of this. Is that right? Bank of America was the targeted bank in both, yes. That was what the district court sort of said in her second justification for introducing the evidence. First, she had said, if I find that this still is the same core of co-conspirators, then it did turn out to be the same core of co-conspirators. She said, well, if it's Bank of America as the common victim, then it's intrinsic. I would submit that having just sort of the similar subject matter, Bank of America being, I believe, the second largest bank in the United States- The only real difference wasn't there was that the one worked through- The conspiracies were after the same thing. They operated mostly the same way. The only difference is that one worked through a bank insider and the other worked from stealing the information from mailboxes. That was essentially- The players were the same and the target was the same. The modus operandi was pretty much the same. Why wouldn't it be intrinsic? I mean, it just changed so that it just was as a matter of convenience. You decided to work through a bank employee rather than stealing the account information from mailboxes. Well, Your Honor, first I would disagree that it's the same set of conspirators. The only person that appears to be in common with Mr. Otoya is somebody named Ty who was not linked directly to Mr. Otoya in the original charged conspiracy. The three women that testified that they were runners as well as this woman, Dami, who was at the center of the thing had all fallen away by this time and were not involved. The only other indication at all that there was a similar co-conspirator was a call coming in from somebody named Zik who was introduced in one line of testimony by one co-conspirator as being involved and his involvement was never fleshed out. Secondly, I would argue that the modus operandi is not the same. It's a switch in time and it is a switch in scheme. In fact, the government argued on appeal, although not below, that it was somehow less risky to work through a bank employee. In fact, it's not because, of course, by the time that type of activity involves individual victims having money removed from their individual accounts whereas the convenience check scheme, all the money came directly from Bank of America. So I don't think that it is in any way less risky. What about the 404B proposition? The defendant claimed that he lacked the mental capacity of the state to join the conspiracy. So the tools of the scheme that were in his possession were relevant and also used to rebut his lack of intent or lack of knowledge defense. Well, I mean, his defense really was more along the lines of it wasn't me and I wasn't there and I didn't do it. And I think that McBride sort of said intent is an issue in every case. This isn't some sort of really specific type of intent that he's showing he knows because he's involved in this later activity. It's simply propensity that if he was involved in some nefarious activity involving Bank of America at a later time, then he must have been involved in this earlier time. But the government needed to prove through the case that it put on, which was the three runners, that this was his picture at the bank and he was depositing these checks. The fact that 18 months later he did something else involving Bank of America potentially does not mean he was the person in the car with these women transacting these checks. It's not a case of some sort of, you know, I didn't realize that I was using someone else's account and later I am shown to have knowingly done that. It's simply, it's just a propensity argument. It's not clear to me that the lower court even really made an alternative 404 ruling. I don't believe the jury was instructed it was 404. And again, in order for it to be 404 evidence, the modus operandi would have to be something closer, you know, to a signature. And these two schemes were really not similar enough. I don't understand why not. I mean, it seems to me to go to a common modus operandi and to knowledge in the absence of mistake. They knew exactly what they were doing. And in both the backpack evidence and the earlier conspiracy involved obtaining Bank of America account holder information and then depositing fraudulent checks into the accounts of college students. There was similar conduct targeting the same bank. And if that isn't relevant 404B evidence, how can that possibly be an abusive description? Well, if the court finds that the similarity of victim in both is enough to make it intrinsic of 404B, I lose. It isn't just that. That's certainly one of the important parts of it. But it was the fact that they took account holder information and they deposited fraudulent checks into these accounts, and the accounts were those, as I understand it, of college students. And so it's not only that the same bank is targeted but that similar conduct is engaged in. In our opinion, the difference in the type of checks and the type of scheme that was being conducted is far more different than, say, the crack and the cocaine at issue in McBride. I mean, this is stealing a convenience check, which the person never even knows that they received. They probably never even knew that a withdrawal was made against their account. The credit card company probably backed it out right away, whereas a counterfeit check targets that individual person and involves bank employees, and any bank fraud is going to involve money transacting fraudulently through accounts. We would argue that that's not sufficient to make these 18-month apart different courses of conduct, different co-conspirators, to be either intrinsic or 404B. And again, the lower court did not admit it as 404B. She admitted it as intrinsic. It did not fall within. It wasn't inextricably entwined. Again, it was not necessary. You may. However, the jury was not instructed not to consider this evidence as propensity evidence, I don't believe. And, you know, it's a different consideration of how they should have applied that proof to the case. I mean, I can hear that the court thinks that the modus operandi is the same and that the victim is the same, and I can simply move on to my second argument, which has to do with the application of the identity theft statute and the corresponding two-year mandatory minimum sentence to the use of an identity voluntarily provided and paid for and compensated co-conspirator. It was our argument that that is not the intended target of an identity theft mandatory additional two-year sentence as the supposed victim was a co-conspirator participant in the crime. As the Fourth Circuit recently found in Hilton, a criminal statute should not be applied to punish conduct that a person could not reasonably understand to be prescribed. And, in fact, it doesn't appear from reading the legislative history that Congress intended a co-conspirator to be considered a victim, resulting in a two-year additional mandatory sentence. It also appears from the Supreme Court's characterization of the government's position in Flores-Figueroa that the government did not understand that statute to prohibit the consenting use, compensated use, of a co-conspirator's identity when they said the government defined the statute's purpose as, quote, providing enhanced protection for individuals whose identifying information is used to facilitate the commission of crimes. It is not my understanding the government generally provides a lot of legal protection for co-conspirators in crimes by sentencing people to additional two-year mandatory minimum sentences. In addition, a case recently came down that Judge Keenan authored in a case called Woods in which the instruction given was not at issue, but the instruction given was that to act without lawful authority means to have transferred or used the means of identification of another person. I don't believe Abdel Shafi precludes the result I'm seeking here because Abdel Shafi, as Judge Agee well knows, involved a misappropriation of lawfully held identities. A Medicare provider had people's information lawfully for Purpose A and unlawfully used it for Purpose B. And so these actually were... Why was that the case? Because those identities were given with permission from the identity holders and they were legitimately victimized when their identities were used for an improper purpose. It was not as here where a co-conspirator said, here, I'm giving you my, I'm selling you my information to use in your scheme. I'm therefore a co-conspirator. I'm helping you. I'm participating. And that act has now got Mr. Otoya an additional two years. The indications all are that the intent of that statute was to protect people who suffered from having their identities stolen and having to go through all the things that go with that, and clearing one's name and having to restore your credit and all of these things, none of which... Unlawful use. Well, but it's the without lawful authority portion, you know, he gave him his identification with his authority. In Flores-Figueroa, the court found that it was... It's lawful authority that allows you to use an identity to create an account as a vehicle through which to process forged checks. Correct. However, the... There's no lawful authority. I know the countenance is that. Well, the authority, the indication is that when Congress created the statute, they intended the without lawful authority language to imply a victim. In fact, Hilton suggests that there is supposed to be a victim. It said the statute leaves us to speculate as to the class of victim meant to be protected by the statute, and the Supreme Court in Flores-Figueroa said that a person who steals an identity needs to know that that's an identity of a real person. If, in fact, it didn't matter whether there was an actual victim of the crime, then... But the focus of the whole statute is on the use to which the identity is put. If you give someone an ID card and it's used to gain... Maybe the person consented to the use of the ID card. Maybe the person that gave you the ID card is a co-conspirator. But if it's used, for example, for... Let's just say someone's been on a terrorist act to use a false ID to gain access to premises to which that person was not entitled to enter, then that would be a use without lawful authority. I mean, whether the co-conspirator agreed to it is irrelevant. It's really a question of the use to which the identification is put rather than the consent with respect to the identification. I would only respond to that by saying I think if that were the case, Flores-Figueroa would have come out a different way because it would then... If the crime that sought to be addressed by this aggravated sentence is simply that a crime is made worse by the use of someone else's identity, it wouldn't matter whether... I'm sorry, Judge Hamilton, did I...? It wouldn't matter whether... I'm sorry, I've lost my train of thought. But it wouldn't matter whether the person knew that it was an ID of a real person or not a real person if the crime to be targeted was the use of a different ID. What do you think 18 U.S.C. 1028a means when it says it applies... This is a quote. It applies to any knowing use of another's identifying information performed without a form of authorization recognized by law. End quote. I simply think that as the court instructed the jury in Woods that to act without lawful authority means to have transferred or used the means of identification of another person without the person's consent or knowledge. Had Mr. Otoi been tried in the Woods court, he would have been acquitted. Well, I don't know about that because I know the Woods court didn't quote just what I got through saying, but in the overall instructions in the Woods court, I think it basically is saying it without the exact words, saying the same thing that 1028a requires. I guess I simply read it differently in that it was not intended to punish somebody for an extra two years by using the identity of a co-conspirator who's not harmed or who volunteers for his own harm or who by his action creates additional harm. Seeing I only have 10 seconds left, I will... I think you've reserved some time for... Thank you. Four minutes. Thank you. Okay. That's just fine. Mr. Herr? Thank you, Your Honor. Good morning, Your Honors. May it please the court. Robert Herr on behalf of the United States. In this case, a jury convicted the defendant of membership in a well-orchestrated scheme that exploited weaknesses in the United States postal system and the banking system to line his pockets with stolen funds. And specifically, the evidence showed that the defendant and his cohorts stole mail from residential mailboxes in affluent neighborhoods, pulled credit card convenience checks from the mail that they stole, deposited those stolen checks into the bank accounts of college students whom they'd recruited to join the scheme, and then quickly withdrew the stolen funds from those student accounts before the Bank of America or the people whose mail had been stolen were any wiser. Chief Judge Chasnow's evidentiary rulings and conclusions at sentencing were proper and the government submits that this court should affirm. I'll spend just one moment on the first argument that Ms. Kahn spent some time on, and that is the question as to whether the evidence was properly admitted as intrinsic evidence or alternatively under Rule 404B. Ms. Kahn stated one thing during her argument that I submit is not correct and not supported by the record, and that is the district court actually did hold, as an alternative, that the evidence was admissible pursuant to Rule 404B. And that is at Joint Appendix 236 through 237. I want to move to the second argument that Ms. Kahn addressed, and that's the appropriate reach of 1028A. And I do want to address the Woods case that was the subject of my friend Ms. Kahn's 28J letter. The Woods case, I submit, is something of a puzzle in that it does at least appear to at least superficially address jury instructions that address the scope of the 1028A statute. But I would submit that the Woods decision is being read a little bit broadly by my friend Ms. Kahn. And one of the primary reasons for that is that Judge Keenan's opinion did not cite Abdel Shafi. And even if this court were to accept Ms. Kahn's argument that Abdel Shafi can be confined to the facts presented in that particular case, Abdel Shafi had plenty of language and dealt at length with the appropriate reach and the appropriate elements of 1028A. And I would submit that if Judge Keenan wanted to issue a different ruling in a very slightly different fact pattern in the Woods decision, she would have at least, that decision would have at least cited Abdel Shafi or discussed it at some length. Nor did Judge Keenan's opinion in the Woods case cite any of the other opinions from this court's sister circuits that have squarely addressed the question as to whether or not 1028A includes a misappropriation element. And those are opinions from the First, Third, Sixth, Eighth, and Eleventh circuits. All of those decisions out of this court's sister circuits squarely rejected the proposition that 1028A includes an element of misappropriation. And again, with respect, I submit that had Judge Keenan intended, and the panel intended for the Woods opinion to have departed from the opinions of all of its sister circuits and established itself as the lone outlier on this issue, there would have been some more detailed analysis and lengthy analysis of it in that opinion. I do want to spend some time now on the third argument presented in Ms. Kahn's brief, and that is the issue of whether or not Chief Judge Chaznow appropriately enhanced the base offense leveled sentencing on the basis of the number of victims involved in the offense. And I do want to spend the bulk of my time on this because it's an issue that, regrettably, was not presented in the government's response brief, but it was raised in, I believe, a footnote at the last page of the defendant's reply brief. And Judge Agee noted that earlier that this court may affirm the holding of the district court on any basis that's fairly presented in the record. And the government submits that there are two alternative bases here, alternatives to the district court's rationale for imposing the sentencing enhancement for the 50 or more victims based on two different grounds. The first is that . . . There is a circuit split, apparently, on when you're a victim and when you're not under this guideline. Your Honor, I regret to say I'm not familiar with the circuit split. Does it address the mail theft rationale or the identification, the means of identification? Because you're talking about the number of victims. That's correct, Your Honor, and the basis that was . . . Whether or not there's a loss when there's reimbursement. That's correct. I apologize, Judge Agee, now I understand. There is a circuit split on that issue, and the government submits that we certainly don't concede that Judge Chasnow's reliance on the fact that some of the account holders here, some of the folks whose mail was stolen, that they did suffer some portion of pecuniary loss and they should be considered victims under the first prong of Section 2B1.1's definition of victim. The government does recognize, though, that that, in light of the circuit split, is probably a much tougher row to hoe than these alternative grounds that rely on the commentary to Section 2B1.1 that expand the definition of victim in cases involving mail theft and in cases involving the use of means of identification without lawful authority. And the record amply supports the application of those alternative definitions of victim in this particular case. So again, the government's not conceding that Chief Judge Chasnow's rationale was mistaken, but also wants to present for the Court's consideration these alternative bases for the Chief Judge Chasnow's. How would you characterize her rationale in the decision? Was it more of a temporal analysis? There's some period of, I mean, that's the way I'd read the circuit split, is whether or not there's some period of time where the victim had to have sustained an actual loss, as that term is defined, whether or not they were reimbursed, because there's some point in time where there was some form of actual loss, and the statute says, you know, any, I don't have it in front of me, any part of the loss counts. That's correct, Your Honor, and I do believe that Chief Judge Chasnow's rationale and the bases on which she relied did fall on one side of the circuit split. Specifically, I believe part of her rationale was she looked at the evidence that was presented with respect to the folks who'd had their mail stolen, and had stolen credit card convenience checks used by the defendant and his cohorts, and said, those people have suffered an inconvenience. They may well have been eventually reimbursed by the Bank of America or by their credit card companies. I mean, one of the worst things about identity fraud is the time that it takes to get it straightened out. And, you know, busy people have to, because of somebody else's, you know, theft and fraudulent acts, have to spend time with the bank, and sometimes it can be the devil to straighten out. It can just consume your days, and it doesn't, you know, eventually, maybe it gets straightened out, but it's a mess. And everybody knows it is who's tried to deal with somebody that's appropriated personal and private information. And even if you eventually get it straightened out, you've lost time, you've lost money, you've been put through anxiety, and I just can't see why anybody is any less a victim who's had to go through that process. And we, you know, we hear it's a clearly erroneous standard anyway, and don't think there's an error of law, but, you know, the victims of identity theft remain victims of what the disruption has brought to their lives, even if they finally recover the nickel. That's exactly right, Your Honor, and unfortunately in this day and age, all too many of us either have been the targets and victims of identity theft, or know other people, friends and family, who have been. And more importantly, Your Honor, the United States Sentencing Commission, in amending and expanding the definition of victim under Section 2B1.1, cited exactly what Your Honor simply went through. In explaining its reason for expanding the victim definition in Section 2B1.1, in the amendment that was effective on November 1st, 2009, the United States Sentencing Commission said, even those who are fully reimbursed by a bank or credit card company must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in loss calculations under the guidelines. The Sentencing Commission saw it exactly the way that you did, Judge Wilkinson, and said, that's why we're going to expand the definition of victim in Section 2B1.1. And that, Your Honor, the government submits is a rationale and a basis that supports Chief Judge Chasnow's ruling. And remand is not necessarily on this issue, because the record that's before this court is replete with evidence tallying up the number of folks whose means of identification were unlawfully used and without lawful authority. For example, at page 190 of the Joint Appendix, one of the cooperating witnesses, Tazita Tesfaye, testified that when she went to a bank in order to cash a check, in order to withdraw some of the stolen funds that lined the defendant's pockets, the defendant himself gave Ms. Tesfaye account numbers, names, and checks bearing the names of other people. As to the number of victims specifically, Ms. Tesfaye also then went on to say, this is at page 189 of the Joint Appendix, that she made 20 separate visits to banks to deposit or withdraw. And that's just, that's totaling up the number of times, that's one witness, one person that participated in this conspiracy, and she said that she went to banks 20 times at the behest of the defendant. Malia Forrester, she was the bank insider who was bribed to provide account information to members of the conspiracy. Ms. Forrester said that in one session, and this is at page 269 of the Joint Appendix, in one session when she logged on to the Bank of America database and pulled down account information to give to members of the conspiracy, in that one session she accessed 15 account profiles. Makeda Tefera, another cooperating witness who testified at trial, about a similar role that she had, she gave similar testimony about the number of times and the number of victims that were afflicted by this. So the record is replete with evidence that supports this basis for affirmance of Judge Chazenow's sentence enhancement, and the government submits that that would be a proper way to go for this court to decide the issue. With respect to the mail theft definition, the record also amply supports the fact that this is a case in which the United States mail was taken from residential mailboxes. Remand on this point is also not necessary because the record contains ample evidence that at least 50 persons had their mail stolen by the defendant and his co-conspirators. For example, at pages 95 to 97 of the Joint Appendix, Ms. Elias, Rebecca Elias, another co-operator, says that she conducted 30 to 40 transactions with checks stolen from the mail. That's 30 to 40 done by one member of the conspiracy. Ms. Elias also testified that when she went on these car trips to drive through neighborhoods, have someone lean out the window and steal mail out of someone's mailbox, she saw a trash bag in the front seat of the car full of stolen mail, and that was only on one mission. Ms. Tazita Taffera at page 330... I'm sorry, Ms. Elias, that trash bag reference is at pages 137 to 141 of the Joint Appendix. Ms. Tazita Taffera at Joint Appendix 335 also said, I saw a plastic bag stuffed full of mail on one of these trips, and that's one car trip. Ms. Taffera also said that she lent her car to other members of the conspiracy. At page 337 of the Joint Appendix, she lent her car to other members of the conspiracy 10 different times to go on these mail retrieval missions. That's what members of the conspiracy called it. So, again, the government submits that on this alternative rationale, the definition of victim as those whose mail has been taken, the government submits that remand is not necessary and the record contains more than enough evidence to affirm Chief Judge Chastanow's sentencing enhancement in terms of the number of victims. Anything further, sir? If the Court doesn't have any questions, I'll cede the balance of my time. Hold on a minute, because I'm... Clyde, do you have anything?  Thank you, Your Honor. Ms. Cahn, happy to hear from you. Thank you, Your Honor. With regard to the number of victims guideline enhancement, I'd like to point out first that the two guidelines that the government has just been discussing, the definitions of victims, were not applied by the lower court, not raised by the government in the lower court, not briefed by the lower court, not briefed by the government in front of this Court. If the...and it seems to me that the government simply wanted to start doing some supplemental briefing via 28 J letters. The applicability of those definitions of victims have not been addressed by Mr. Otoya and we believe we would need a remand to begin recounting victims and litigate the applicability of those definitions. With regard to the evidence which Mr. Hurst says is replete in the record, the indications of which transactions the Court actually found were attributable, foreseeable to Mr. Otoya, are on page 748 through 750 of the joint appendix and are bracketed. The lower court did not find the majority of the transactions that he was referring to to even be attributable to Mr. Otoya. Tessetta Tesfaye testified that she went to bank to withdraw money on about 20 occasions. Of those, Otoya was present for four or five. Of the 30 to 40 transactions Elias conducted in 2008, she got checks a few times from Otoya and no relationship between any other transactions that they did and Mr. Otoya was ever established. With regard to the victim enhancement that was applied by the lower court, I don't believe that there really is a circuit split. Judge Agee, I believe that the authority is squarely on our side, that the way that the lower court interpreted victim was incorrect. There has to be an actual pecuniary loss. The hassle that has gone through does not count under any... Some circuits, I thought, had taken the view of the case from the First Circuit that going with the language of any part of the loss, that certainly there has to be some point in time when the victim's account is accessed where there's a deficit in that account, even if it's made up later by reimbursement by the credit card issuer or the bank. Why wouldn't that qualify as a victim? I believe in this Topanian case they were talking about skimming devices, which actually involved debit cards, and that is an actual cash withdrawal from your account. That definition, the Topanian definition, may arguably apply to the class of victims from our extrinsic evidence in which the counterfeit checks were drawn on accounts and money actually did come out. The government only presented evidence of one of those people that had to spend time and money and actually had money come out of their account. The convenience check scheme was charges made to credit cards, and there's no evidence that the cardholder was ever billed or paid those debts before the... Why does that have to be a factor? Why isn't the fact that simply that that occurred in their credit record, why isn't that sufficient? I mean, there had to be some debit in their account at some point in time. Because the actual pecuniary loss never fell to the victim. It only fell to Bank of America. So they were the sole victim. That's not a loss. The guideline speaks in terms of any part of the loss. Well, actually, in Stepanian, they specifically reserved the question of whether a credit card debt that is never charged or paid by the consumer would qualify as an actual pecuniary loss. So even under Stepanian, you know, there's no authority for the lower court to find that the victims of the credit card scheme were victims under that definition. The other case that the lower court relied on was Lee out of the 11th Circuit, in which, again, there was an actual pecuniary loss that befell. People obtained goods and services, paid for them with bad checks, and the victims had to spend time and money in recouping those losses. That didn't happen to these convenience checks holders. In fact, there's not even any evidence that they ever even knew that this charge was placed in their account. So basically the defendant gets a free pass if the creditor makes the victim whole. Well, I don't think that there was anything to make whole. There was never a charge. There's no evidence that there was ever a charge placed on their account or they ever expended any money or even knew. And it's not so much as, you know, my opinion is. I think that's what the guidelines say, and that's what the 6th, 8th, 3rd, 2nd, 10th, 9th Circuits all say. Let me ask you this. I don't want to interrupt you, but how do you equate that argument with the Amendment 726 to the guideline 2B1.1b2? That amendment clearly refuted the 5th, 3rd, 6th, 9th, and 10th Circuits in their opinions. The amendment – I'm sorry because the numbers are – the amendment that provides for victims of identity theft, perhaps that could be applied by the lower court. It was not applied by the lower court. It was not raised by the government, and it wasn't raised here by the government. If we're going to start recounting the victims because, for example, when you look at their chart, there are victims listed. They appear to be married. There are some victims here that appear twice. And if we're going to start calling the theft of a convenience check to be a theft of an identity, then we need to hash that. It took the district court two days to go through this. I don't think this amendment was a new law. It was a clarification, but I don't think it was a new law. So what prohibits us from relying on that? I think it was an expansion of the definition of victims, and it was not the one that was applied by the district court. It was not – you know, if we – I understand that, but I'm asking you what would prohibit us from considering that Amendment 726. As I'm saying, I believe that we would need to be able to argue whether the theft of a convenience check is a theft of an identity. We'd have to count how many victims that applies to of the ones that the district court actually attributed to Mr. Otoya because it may not even add up to 50 in any event. And because I – It may add up to a lot more than that. Isn't there something like 884 identified in that chart? No, it's significantly fewer than that. There's 78 entries here, and some of these are the same people. Some of these appear to be – I mean, for example, in entries 32 through 35, that's the same person. In entries 37 through 39, that's the same person. Some of those the lower court found were foreseeable to Mr. Otoya and some not. You know, I put a footnote in. I did, and I acknowledged that these guidelines existed. The government didn't. The lower court didn't. And I did that as an officer of the court and to be able to suggest that they shouldn't apply. Thank you very much. Thank you, Your Honor. If you're court-appointed and you've done a fine job, I wish to express the appreciation of the court for your assistance. Thank you, Your Honor. We'll come down and recounsel and move directly into our next case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Clyde H. Hamilton